## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LILIAN MARTINEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-0157 (ABJ) |
| ) | |
| GALI SERVICE ) | |
| INDUSTRIES, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| CARMEN RECINOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-0158 (ABJ) |
| ) | |
| GALI SERVICE ) | |
| INDUSTRIES, INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION & ORDER</u>

Plaintiffs Lilian Martinez and Carmen Recinos each filed a separate lawsuit against the following defendants: Gali Service Industries, Inc. ("GSI"); the GSI Group; Francisco J. Gali, Jr., the director and CEO of GSI; Francisco Gali, Sr., president of the GSI Group; and a John Doe Corporation that was alleged to have taken over operations from GSI since September 2018. *See* Martinez Compl., Civ. A. No. 19-157, [Dkt. # 1] ("Martinez Compl."); Recinos Compl., Civ. A. No. 19-158, [Dkt. # 1] ("Recinos Compl."). Plaintiffs claim that defendants violated various federal and state laws when they discriminated against them on the basis of their sex, failed to pay

them the appropriate wages, retaliated against them for reporting sexual harassment, and negligently supervised their employees. Martinez Compl. at 2–3; Recinos Compl. at 2–3. Plaintiffs seek redress under D.C. common law, Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the District of Columbia Human Rights Act, D.C. Code §§ 2-1402.01, *et seq.* ("DCHRA"), the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the District of Columbia Minimum Wage Revision Act, D.C. Code §§ 32-1001, *et seq.* ("DCMWRA"), and the District of Columbia Wage Payment and Collection Law, D.C. Code §§ 32-1301, *et seq.* ("DCWPCL"). *See* Martinez Compl. at 1–2; Recinos Compl. at 1–2.

Pending before the Court are plaintiffs' motions for default judgment against the four named defendants pursuant to Federal Rule of Civil Procedure 55(b). *See* Martinez's Mot. for Default J., Civ. A. No. 19-157 [Dkt. # 22] ("Martinez Mot."); Recinos' Mot. for Default J., Civ. A. No. 19-158 [Dkt. # 23] ("Recinos Mot."). Having considered plaintiffs' submissions, the applicable case law and statutory authority, and the record of the case as a whole, the Court will grant both plaintiffs' motions for default judgment in part, finding defendants liable on all claims. However, to enable the Court to determine the appropriate amount of damages to award, plaintiffs may supplement the record as described in more detail below by November 2, 2020, and the Court will hold a hearing on the matter.

## BACKGROUND

### I. Factual Background

From June 2, 2016, until her termination on or about July 11, 2016,[1] plaintiff Martinez was employed as "a cleaner for [d]efendants" at an office building located at 316 Pennsylvania Avenue,

---

1   Martinez had also worked for defendants for approximately one week in 2015. Martinez Compl. ¶ 30.

SE, Washington, D.C.  Martinez Compl. ¶¶ 12–13.  Plaintiff Recinos was employed by defendants at the same address from January 2016 to July 8, 2016.  Recinos Compl. ¶¶ 12–13.  Gali Services Industries, a subsidiary of the GSI group, is a Maryland corporation that, at the time relevant to this complaint, provided "janitorial/custodial and building maintenance services" in the District of Columbia.  Martinez Compl. ¶¶ 16–17; Recinos Compl. ¶¶16–17.

Martinez was hired to work from "5:00 pm to 9:00 pm, five days per week, from Monday through Friday" at a "rate of pay [of] $10.50 per hour."  Martinez Compl. ¶¶ 33–34.  Her duties included "sweeping, mopping, dusting, and wiping down surfaces in various offices" located within 316 Pennsylvania Avenue, SE.  *Id.* ¶¶ 35–36.  Recinos also typically worked weekdays from 5:00 pm to 9:00 pm, Recinos Compl. ¶ 32, but she was paid $11.50 per hour and her duties included taking out the trash, vacuuming, dusting, and cleaning kitchens.  *Id.* ¶¶ 33, 35.  Plaintiffs' immediate on-site supervisor, who had started working for defendants on June of 2016, was Misael Omar Lainez.  Martinez Compl. ¶ 37; Recinos Compl. ¶ 36.  Plaintiffs' second-line off-site supervisor was Lisette (last name unknown).  Martinez Compl. ¶¶ 31, 37–38; Recinos Compl. ¶¶ 36–37.  Lisette was also Lainez's direct supervisor.  Martinez Compl. ¶ 38; Recinos Compl. ¶ 37.

Plaintiffs allege that in June of 2016, Lainez "subjected [them] to several incidents of unwelcome sexual harassment."  Martinez Compl. ¶ 43; Recinos Compl. ¶ 42.  Lainez made sexually suggestive comments about Martinez's appearance such as "[y]ou look very good today," Martinez Compl. ¶ 44, and he would threaten her if she did not perform sexual acts by stating in Spanish "[y]ou need to kiss me; otherwise I will call immigration on you."  Martinez Compl. ¶¶ 44–45.  At least once, Lainez told Martinez "that he was going to lock himself in the office with her," causing her to "fear[] for her physical safety."  Martinez Compl. ¶ 46.  With Recinos, Lainez

would repeatedly say words to the effect of "I like you" and "[w]e could have a secret relationship." Recinos Compl. ¶ 43.  He would also comment on her body and tell her that he wanted to kiss her. *Id.*  Other times, Lainez would scare Recinos by turning off the lights while she was cleaning, sneaking up on her, or unplugging the vacuum while she was using it.  *Id.* ¶ 44.  Sometimes, Lainez would not say anything at all to the two women – he would just sit and watch them clean, which would make them both incredibly uncomfortable.  Martinez Compl. ¶¶ 47–48; Recinos Compl. ¶ 44.

Martinez repeatedly rejected Lainez's sexual advances, telling him that she was married and that she was not interested in him.  Martinez Compl. ¶¶ 49–50.  She reminded him that there were security cameras in the building, but this "had no effect on his behavior."  Martinez Compl. ¶¶ 49–50.  Recinos would similarly tell Lainez that she was married and that she just wanted to work.  Recinos Compl. ¶ 46.

Both plaintiffs called and texted Lisette multiple times in June of 2016 to report the comments and advances, but Lisette did not respond.  Martinez Compl. ¶ 50; Recinos Compl. ¶ 46. In late June, Recinos was finally able to connect with Lisette, and she informed her of the inappropriate comments Lainez had made, but Lisette laughed at Recinos, saying that something must be wrong with her because a woman should like it when a man thinks she is pretty.  Recinos Compl. ¶ 47.  Recinos alleges that Lisette did not take any action after this conversation.  *Id.*

On June 30, 2016, Lainez approached Martinez from behind, wrapped his arms around her and pinned her arms to the sides of her body so that she could not move.  Compl. ¶ 51.  He then groped her breasts and between her legs through her clothing.  *Id.*  A struggle ensued, during which Martinez was finally able to break free.  *Id.* ¶ 52.  Lainez then warned her "to remain in the kitchen until he returned, saying words to the effect that, '[i]f you say anything, I'll call immigration.'"

*Id.* ¶ 53.  Lainez also "threatened to kill [p]laintiff if she reported his actions" and "referenced his connection to 'La Mara,'" a nickname for the dangerous criminal gang MS-13.  *Id.*  Terrified and shaken, Martinez remained in the kitchen until Lainez returned and told her that she could leave for the day.  *Id.* ¶ 54.

On July 1, 2016, Martinez called Lisette to report the attack and the "explicit comments and harassment" that Lainez had subjected her to.  Martinez Compl. ¶ 55.  She "stat[ed] that she no longer felt safe around him."  *Id*. ¶ 55.  Lisette responded saying "that's just how he is," and instructed Martinez to continue to work with Lainez.  *Id.* ¶ 56 (internal alterations omitted).  From July 1 to July 6, 2016, Martinez continued to work under Lainez's supervision as directed, and during that time, Lainez "behaved angrily" and allegedly retaliated against her by "assign[ing] her additional offices to clean."  *Id.* ¶ 57.

On or about July 6, 2016, Recinos was gathering trash when Lainez entered the room where she was working.  Recinos Compl. ¶ 49.  While her back was turned, Lainez came up behind her and grabbed her breasts and groin area.  *Id.*  He bit her neck and arm, leaving visible marks, and then threw Recinos against a wall.  *Id*.  He pushed her to the ground, attempted to rip off her clothing, and then started to unbutton his pants.  *Id.*  During the course of this assault, Recinos's head hit the floor, her shirt was ripped, and she received scratches on her arms.  *Id.* ¶ 50.  Lainez told Recino that no one would believe that he did this to her, and he threatened her life if she told anyone.  *Id*. ¶ 51.  She managed to escape and ran out of the building.  *Id.* ¶ 52.  On the way, Recinos ran into Martinez and told her what happened.  Martinez Compl. ¶ 58; Recinos Compl. ¶¶ 52–53.  Recinos was crying and shaking during this conversation.  Recinos Compl. ¶ 52.

That same day, July 6, 2016, Recinos called Lisette to report the attack, and she told Lisette that she feared going into work.  Recinos Compl. ¶¶ 54–55.  Lisette told her to return anyway and assured her that she would talk to Lainez.  *Id.*

On July 7, 2016, Martinez called Lisette to discuss the issue again.  Martinez Compl. ¶ 59. During this conversation, "Lisette stated that she 'might' visit the building to speak to [ ] Lainez about the incidents, but reiterated that [Martinez] and [Recinos] should continue to go to work despite [ ] Lainez's presence there."  *Id.*

Both plaintiffs reported to work as instructed.  Martinez Compl. ¶ 60; Recinos Compl. ¶ 56. On July 7, 2016, near the end of her shift that day, Lainez told Martinez to go to the office "where [she] typically signed in and out for each shift."  Martinez Compl. ¶ 61.  She "assumed [that his request] was work-related and went to Mr. Lainez's office on the basement floor, where there were no windows."  *Id.*  While in the office, "Lainez asked [Martinez] if she had any lotion he could use."  *Id*. ¶ 62.  As she "reached into her bag to retrieve the lotion, Mr. Lainez instructed her to sit on his lap."  *Id.*  "Feeling frightened, [Martinez] refused and began to leave."  *Id.*  Suddenly, Lainez grabbed her and forcefully kissed her.  *Id*. ¶ 63.  Plaintiff broke free and ran toward the elevator, which was already open, to escape.  *Id.*

Lainez followed Martinez into the elevator and "continued to violently attack [her]." Martinez Compl. ¶ 64.  He "grabbed her breasts and squeezed her genitals" through her clothing, laughing in her face and telling her "she did not know [who] she was messing with and that Lisette would never believe her."  *Id.* (internal quotation marks omitted).  The elevator doors opened on the fourth floor, where Recinos was cleaning, and she "observed [Martinez] struggling to get away from Mr. Lainez."  Martinez Compl. ¶ 66; Recinos Compl. ¶ 57.  Martinez broke free and rushed out of the elevator, as Lainez warned both women from inside "that no one would believe them if

they reported him." Martinez Compl. ¶ 67; Recinos Compl. ¶ 59. He threatened that "if they reported him, he had friends and family in a gang" who he would send to kill them. Martinez Compl. ¶ 67; Recinos Compl. ¶ 59. Plaintiffs hid in a nearby empty office and called the police. Martinez Compl. ¶ 68; Recinos Compl. ¶¶ 60–61.

According to the complaints, "[s]hortly after the police arrived, Lisette also arrived at the building, and appeared to be furious that [p]laintiff[s] had called the police." Martinez Compl. ¶ 70; Recinos Compl. ¶ 63. The detective at the scene took Martinez into a room to speak with her privately, "and told her that Lisette had informed him that she would fire both [p]laintiff and her coworker for 'causing trouble' by calling the police." Martinez Compl. ¶ 71. Recinos did not speak to the police. Recinos Compl. ¶ 64. That evening, the police arrested Lainez, and he was "ultimately charged and convicted of three counts of misdemeanor sex abuse and one count of simple assault." Martinez Compl. ¶ 72; Recinos Compl. ¶ 65.

The next day, on July 8, 2016, "Lisette confronted [Martinez] as she arrived to work and informed her that she should leave work that day and not return." Martinez Compl. ¶ 73. Later that day, Lisette told Recinos that she should not have called the police and fired her. Recinos Compl. ¶ 67.

Over the weekend, on July 9 or 10, "Lisette texted [Martinez] and requested that she come to the office on Monday July 11, 2016 at her usual work time so she could sign some papers." Martinez Compl. ¶ 74. On that Monday, "Lisette terminated [Martinez's] employment, referencing the incident and [p]laintiff's reporting [of] the assault to the police as the basis for termination." Id. ¶ 75. Martinez asked for her last paycheck, and Lisette told her that it would be sent to her. Id. ¶ 76. But she "never received her last paycheck from the company, covering two weeks of work, or 40 hours, for a total of $420.00." Id. ¶ 77.

Later that week, Recinos went to defendants' Maryland office to pick up her last paycheck, but it was missing approximately one weeks' worth of pay for about 20 hours' worth of work during her last week.  Recinos Compl. ¶¶ 69–71.  The company also did not compensate plaintiff for 100 hours of work she performed in June of 2016 when another employee was out on leave. *Id.* ¶ 72.  During that time, she worked 60 hours a week for two weeks, but was only compensated for 20 hours per week.  *Id.*  In total, Recinos was not compensated for 120 hours of work, including 20 hours of overtime.  *Id.* ¶ 73.

## II.    Procedural Background

On April 17, 2017, Recinos filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Office of Human Rights ("DCOHR") alleging discrimination and retaliation on the basis of her sex, in violation of Title VII and the DCHRA.  Recinos Compl. ¶ 26.  On April 19, 2017, Martinez did the same.  Martinez Compl. ¶ 26.  The EEOC issued both plaintiffs a notice of right to sue on November 7, 2018. Martinez Compl. ¶ 28; Recinos Compl. ¶ 28.

On January 24, 2019, plaintiffs filed two separate complaints in this Court.  *See* Martinez Compl.; Recinos Compl.  The summons and complaint in both cases were served on GSI on February 26, 2019, *see* Aff. of Service, Civ. A. No. 19-157 [Dkt. # 5], Aff. of Service, Civ. A. No. 19-158 [Dkt. # 6]; GSI Group on April 4, 2019, *see* Proof of Receipt, Ex. 2 to Aff. of Due Diligence, Civ. A. No. 19-157 [Dkt. # 6-2], Proof of Receipt, Ex. 2 to Aff. of Due Diligence, Civ. A. No. 19-158 [Dkt. # 7-2]; and Francisco Gali, Sr. on March 28, 2019.  *See* Aff. of Service, Civ. A. No. 19-157 [Dkt. # 7]; Aff. of Service, Civ. A. No. 19-158 [Dkt. # 8].  On May 16, 2019, the Court granted plaintiff's motion for service by publication on defendant Francisco J. Gali, Jr. after

reasonable avenues for personal service had been exhausted.  *See* Order, Civ. A. No. 19-157 [Dkt. # 9]; Order, Civ. A. No. 19-158 [Dkt. # 10].

On July 5, 2019, plaintiffs moved for entry of default against all defendants for failing to respond to plaintiff's complaint.  *See* Mot. for Entry of Default Against all Defendants, Civ. A. No. 19-157 [Dkt. # 11] at 4; Mot. for Entry of Default Against all Defendants, Civ. A. No. 19-158 [Dkt. # 12] at 4.  On July 11, 2019, the Court granted Entry of Default with respect to defendants GSI, GSI Group, and Francisco Gali, Sr.  *See* Min. Order, Civ. A. No. 19-157 (July 11, 2019); Min. Order, Civ. A. No. 19-158 (July 11, 2019); *see* Clerk's Entry of Default, Civ. A. No. 19-157 [Dkt. ## 13–15]; Clerk's Entry of Default, Civ. A. No. 19-158 [Dkt. ## 14–16].  The motion was held in abeyance with respect to Francisco J. Gali, Jr., pending the submission of an affidavit setting forth the completed methods of service pursuant to Federal Rule of Civil Procedure 4(l), and denied without prejudice as to defendant John Doe Corporation.  *Id.*  Given that no proof of service appeared to have been filed with respect to defendant John Doe Corporation within the time required by Rule 4 of the Federal Rules of Civil Procedure, the Court further ordered plaintiff to either file proof of service or show cause why defendant John Doe Corporation should not be dismissed from this case for want of prosecution.  Order, Civ. A. No. 19-157 [Dkt. # 12]; Order, Civ. A. No. 19-158 [Dkt. # 13].

On July 12, 2019, plaintiffs submitted the necessary affidavits setting forth the details of plaintiffs' service to Francisco J. Gali, Jr.  Aff. of Service, Civ. A. No. 19-157 [Dkt. # 16]; Aff. of Service, Civ. A. No. 19-158 [Dkt. # 17].  In light of the affidavit, the Court directed the Clerk of the Court to enter default against Francisco J. Gali, Jr., *see* Min. Order, Civ. A. No. 19-157 (July 12, 2019); Min. Order, Civ. A. No. 19-158 (July 12, 2019), and this was completed on July 15,

2019.  Clerk's Entry of Default, Civ. A. No. 19-157 [Dkt. # 17]; Clerk's Entry of Default, Civ. A. No. 19-158 [Dkt. # 18].

On July 25, 2019, plaintiffs filed a response to the Court's show cause order, which requested additional time to serve John Doe Corporation, as well as an order permitting plaintiff to take discovery from the named defendants, should they appear, to ascertain the identity of the John Doe Corporation.  Pl.'s Resp. to Show Cause Order, Civ. A. No. 19-157 [Dkt. # 18] at 1–3; Pl.'s Resp. to Show Cause Order, Civ. A. No. 19-158 [Dkt. # 19] at 1–3.  On July 30, 2019, the Court granted plaintiffs' requests.  *See* Min. Order, Civ. A. No. 19-157 (July 30, 2019); Min. Order, Civ. A. No. 19-158 (July 30, 2019).

On October 28, 2019, plaintiffs filed the pending motions for default judgment as to defendants GSI, the GSI Group, Francisco Gali, Sr., and Francisco J. Gali, Jr.  Martinez Mot.; Recinos Mot.  Each plaintiff seeks a judgment in the amount of $400,000.00 in compensatory damages and $200,000.00 in punitive damages for the federal and state employment claims. Martinez Mot. at 28; Recinos Mot. at 28.  Martinez also seeks $420 in unpaid wages and $1,260 in liquidated damages, plus attorney's fees and costs, and an amount to be determined by the court for the negligent supervision claim.  Martinez Mot. at 21–22, 26–28.  Recinos seeks $1,495 in unpaid wages and $4,485 in liquidated damages, plus attorney's fees and costs, and an amount to be determined by the court for the negligent supervision claim.[2]  Recinos Mot. at 21–23, 26–28.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed

---

[2]     In their motions, plaintiffs requested additional time to file a submission establishing the amount of attorneys' fees, so the Court will not address that portion of the award further in this opinion.

to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a).  After a default has been entered, a court may enter a default judgment order pursuant to Rule 55(b). *See* Fed. R. Civ. P. 55(b).  Although there is a general "federal policy favoring trial over default judgment[,]" *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995), "when the adversary process has been halted because of an essentially unresponsive party . . . , the diligent party must be protected" by awarding a default judgment. *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016), quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curium) (omission in original).

"The determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F.Supp. 2d 56, 57 (D.D.C. 2008), citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980).  Upon entry of default by the Clerk of the Court, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (internal citation omitted).

"Although the default establishes a defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." *Id.*, citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001).  Accordingly, when moving for a default judgment, the plaintiff must prove its entitlement to the amount of monetary damages requested. *Id.* (citation omitted).  "In ruling on such a motion, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Id.* (citation omitted).  The court may also conduct a hearing to "determine the amount of

damages." Fed. R. Civ. P. 55(b)(2)(B).  Finally, the movant is "entitled to all reasonable inferences from the evidence offered."  *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981).

**ANALYSIS**

Plaintiffs have alleged that their employer unlawfully discriminated against them based upon their sex when it subjected them to a hostile work environment involving sexual innuendo, threats, and assaults in violation of Title VII (Count 1) and the D.C. Human Rights Act ("DCHRA") (Count 3).  Martinez Compl. ¶¶ 78–92, 107–22; Recinos Compl. ¶¶ 74–88, 102–18. Plaintiffs also allege that when they attempted to report the sexual harassment to their second-line supervisor, Lisette, and to the police, they were retaliated against and terminated in violation of Title VII (Count 2) and the DCHRA (Count 4).  Martinez Compl. ¶¶ 93–106, 123–37; Recinos Compl. ¶¶ 89–101, 119–32.  The complaints contain claims that defendants violated the FLSA (Count 5), the DCMWRA (Count 6), and the DCWPCL (Count 7) when they failed to pay both plaintiffs for hours worked.  Martinez Compl. ¶¶ 138–62; Recinos Compl. ¶¶ 133–66.  Finally, plaintiffs claim that defendants were negligent in their supervision of Lainez.  Martinez Compl. ¶¶ 163–67; Recinos Compl. ¶¶ 167–71.

## I.    Title VII and DCHRA Hostile Work Environment Claims

Under Title VII, it is unlawful for an employer "to discriminate against any individual . . . because of . . . sex," 42 U.S.C. § 2000e–2(a)(1), and such discrimination "includes creating a hostile or abusive work environment if the harassment is sufficiently abusive to affect a 'term, condition, or privilege' of employment."  *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002), quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986).  Similarly, the DCHRA prohibits employers from discriminating against any individual on the basis of sex.  *See* D.C. Code § 2-1402.11(a)(1).  Because the legal standards for establishing discrimination claims

under Title VII and the DCHRA are the same in substance, the Court will analyze plaintiffs' claims under these statutes together. *See Burrell v. Shepard*, 321 F. Supp. 3d 1, 9 (D.D.C. 2018), citing *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999).

> To prove a Title VII hostile work environment claim, the plaintiff employee must show:
>
> > (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome[ ] sexual harassment . . .; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . .; and (5) the existence of respondeat superior liability.

*Davis*, 275 F.3d at 1122–23 (alteration and omission in original) (internal quotation marks omitted). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 102 (D.D.C. 2012), quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). "To determine whether a hostile work environment existed, the court must examine all the circumstances of a plaintiff's employment, including: the frequency of the discriminatory conduct, its severity, whether it was threatening and humiliating (or was merely offensive), and whether it unreasonably interfered with the employee's work performance." *Id.*

The Court finds that both plaintiffs have established that they were discriminated against on the basis of their sex as they were subjected to a hostile work environment. On multiple occasions for approximately one month, Lainez, who was plaintiffs' direct on-site supervisor, made sexually suggestive comments to plaintiffs, commented on their appearances, proposed sexual activity, and engaged in otherwise intimidating behavior. *See* Martinez Compl. ¶¶ 43–47; Recinos Compl. ¶¶ 43–46. Plaintiffs reported the conduct to his supervisor, but they were

rebuffed, and what began with inappropriate comments escalated, as Lainez threatened both women that they would suffer serious consequences for failing to comply. *See e.g.*, Martinez Compl. ¶ 46 (alleging that Lainez told Martinez that he would lock himself in the office with her); *id*. ¶ 45 (alleging that Lainez threatened to call immigration and report her); Recinos Compl. ¶ 59 (same); Martinez Compl. ¶ 53 (alleging that Lainez told plaintiffs that he had connections to a dangerous gang, implying that plaintiffs' lives would be in danger if they did not comply); Recinos Compl. ¶ 51 (same). Ultimately, he sexually assaulted each of them. Martinez Compl. ¶¶ 51–54, 61–65; Recinos Compl. ¶¶ 49–52. He was arrested and prosecuted criminally, and defendants' reaction was to fire the victims for reporting the assaults. Martinez Compl. ¶¶ 72–75; Recinos Compl. ¶¶ 65–67.

Given all of Lainez's actions and his supervisor's inaction, plaintiffs have sufficiently alleged an intimidating, hostile, and offensive working environment that unreasonably interfered with their work performance. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (collecting cases) (finding that even "a single physical act – such as a physical assault – can create a hostile work environment") (emphasis omitted). Thus, plaintiffs have shown they are entitled to default judgment on Counts 1 and 3 of their complaints.

## II.    Title VII and DCHRA Retaliation Claims

Title VII separately makes it "an unlawful employment practice for an employer to discriminate against any . . . employee[] . . . because [she] has opposed any practice made an unlawful employment practice . . . or because [she] has made a charge" under the subchapter. 42 U.S.C. § 2000e–3(a); *see Burlington Northern & Santa Fe Ry. Corp. v. White*, 548 U.S. 53, 58, 70–73 (2006) (unlawful to retaliate against employee for having opposed sexual harassment).

Retaliation is prohibited under the DCHRA as well.  *See* D.C. Code. § 1-1402.61.[3]  To prove their retaliation claims, plaintiffs must establish that (1) they opposed an unlawful employment practice; (2) their employer took a materially adverse personnel action against them; and (3) a causal connection existed between the two.  *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *see also Durant v. D.C. Gov't*, 875 F.3d 685, 696–97 (D.C. Cir. 2017).  "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528 (2013).

Plaintiffs engaged in protected activity when they (1) rejected their supervisor's sexual advances, (2) complained of his behavior to their off-site supervisor, and (3) reported Lainez's second assault to the police.  Martinez Compl. ¶¶ 48–50, 55, 58–59, 68–69; Recinos Compl. ¶¶ 45–47, 55, 61–62; *see McKenna v. Weinberger*, 729 F.2d 783, 787, 791 (D.C. Cir. 1984) (complaining to supervisors about sexual harassment is "protected activity"); *McCain v. CCA of Tenn., Inc.*, 254 F. Supp 2d 115, 124 (D.D.C. 2003) (rejecting sexual advances is statutorily protected activity); *Essex Ins. Co. v. Night & Day Mgmt., LLC*, 536 F. Supp. 2d 53, 58 (D.D.C. 2008) (finding that filing a police report constitutes "protected activity" for purposes of a retaliation claim).  Plaintiffs were both terminated, which is undoubtedly an adverse employment action.  *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009).

The complaints also allege that Lisette made no secret of why she was punishing the plaintiffs; they assert that she expressly tied the employment action to the fact that the women reported their supervisor to the police.  Martinez Compl. ¶¶ 71 (alleging that a police officer told

---

3       As previously stated, the legal standards under the DCHRA are the same as those governing Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.  *See Burrell*, 321 F. Supp. 3d at 9; *Carpenter*, 165 F.3d at 72 (D.C. Cir. 1999); *see also Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994).

Martinez that Lisette had informed him that she would fire both Martinez and Recinos for "causing trouble" by calling the police); *id.* ¶ 75 (alleging that when Martinez was fired, Lisette referenced incident and her reporting of the assault to the police); Recinos Compl. ¶¶ 66 (alleging that Lisette had told a police officer that she would fire both Martinez and Recinos for "causing trouble" by calling the police); *id.* ¶ 68 (alleging that Lisette told her that she should be prepared for the consequences if she "talked").   And, even in the absence of direct evidence, causation may be "inferred . . . when the retaliatory act follows close on the heels of the protected activity."  *Smith*, 905 F. Supp. 2d at 104; *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (noting that close temporal proximity may give rise to an inference of causation).   Martinez was terminated on July 11, 2016 – only a few days after she was assaulted and reported Lainez to the police. Martinez Compl. ¶¶ 59–68, 75.   Recinos was terminated on July 8, 2016, only two days after her assault and one day after the women summoned the police.   Recinos Compl. ¶¶ 49–50, 51–61, 67.

Therefore, the Court finds that plaintiffs have established causation along with the other elements of a retaliation claim, and it will grant plaintiffs' motion for default judgment as to Counts 2 and 4.

## III.    Wage Claims

"The Fair Labor Standards Act guarantees all 'employees' a federal minimum wage" and overtime pay.  *Rhea Lana, Inc. v. United States*, 925 F.3d 521, 522–23 (D.C. Cir. 2019), quoting 29 U.S.C. § 206(a).  Similarly, the DCWPCL requires every employer to "pay all wages earned to his or her employees . . . at least twice during each calendar month," *see* D.C. Code § 32-1302, and the DCMWRA sets the minimum wage "to be paid to any employee by any employer in the District of Columbia."  *See* D.C. Code § 32-1003(a), (c).  The D.C. laws are construed consistently with the FLSA with respect to determining the liability of an employer.  *See Ventura*

*v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 n.2 (D.D.C. 2010); *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009).

Under the FLSA, the term "employee" "means any individual employed by an employer." 29 U.S.C. § 203(e)(1); *see* D.C. Code § 32–1002. To determine "employee" status, the Court must examine the "economic reality" between the parties, *Goldberg v. Whitaker House Co-op, Inc.*, 366 U.S. 28, 33 (1961), which includes consideration of "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Morrison*, 253 F.3d at 11, quoting *Henthorn v. U.S. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994).

An "employer," in turn, means "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "[A] corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Murcia v. A Capital Elec. Contractors, Inc.*, 270 F. Supp. 3d 39, 45 (D.D.C. 2017) (internal quotation marks and citation omitted); *see Ventura*, 738 F. Supp. 2d at 5. "In assessing whether an individual should be considered an 'employer' for purposes of the FLSA and DCMWRA, courts apply the four factors, discussed above, as well as 'the ownership interest of the corporate officer.'" *Id.*, citing *Ventura*, 738 F. Supp. 2d at 5–6. Thus, "an individual who exercises operational control over an employee's wages, hours, and terms of employment [may] qualif[y] as an 'employer.'" *Id.*, quoting *Guevara v. Ischia, Inc.*, 47 F. Supp. 3d 23, 26 (D.D.C. 2014).

Plaintiffs allege that they were defendants' employees. Martinez Compl. ¶ 13; Recinos Compl. ¶ 13. They state that Gali Services Industries Inc. is a subsidiary of GSI Group, and

Francisco Gali, Jr. is the director and CEO of GSI, and Francisco Gali, Sr. is the president of GSI. Martinez Compl. ¶¶ 16–20; Recinos Compl. ¶¶ 16–20.  They allege that these defendants had actual and apparent authority to hire and fire them, direct and supervise their work, and set wage and hour policies applicable to them.  Martinez Compl. ¶ 21; Recinos Compl. ¶ 21.

Martinez asserts that she was not paid for her last two weeks of work – a total of forty hours.  Martinez Compl. ¶¶ 33–34, 76–77.  Recinos asserts that she was not paid for approximately 120 hours of work, including 20 hours of overtime.  Recinos Compl. ¶¶ 71–73.  These assertions state violations of the FLSA, *see* 29 U.S.C. § 206(a), the DCMWRA, *see* D.C. Code § 32-1003(a), and the DCWPCL, *see* D.C. Code § 32-1302.  Additionally, based on defendants' failure to pay plaintiffs' earned wages not later than the working day following their discharge, defendants violated the DCWPCL.  *See* D.C. Code § 32-1303(1) ("Whenever an employer discharges an employee, the employer shall pay the employee's wages earned not later than the working day following such discharge . . . .").  Finally, liability appropriately extends jointly and severally to all defendants – the corporate entity and its corporate officers – because they are alleged to be plaintiffs' employers.  *See Murcia*, 270 F. Supp. 3d at 44–45.

## IV.    Negligent Supervision Claim

"Liability for negligent supervision arises when an 'employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee.'"  *Godfrey v. Iverson*, 559 F.3d 569, 571 (D.C. Cir. 2009), quoting *Brown v. Argenbright Sec.*, 782 A.2d 752, 760 (D.C. 2001).  Thus, negligent supervision goes beyond the concept of *respondeat superior*, and analyzes an employer's duty to its employees' activities that

sometimes go outside the scope of employment.  *See Brown*, 782 A.2d at 760, citing *Murphy v. Army Distaff Foundation*, 458 A.2d 61, 63 (D.C. 1983).

"[A] common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law." *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564, 576 (D.C. 2007).  "A claim that an employer negligently supervised an employee who has sexually harassed a co-employee does not transmute sexual harassment into a common law tort." *Id.* at 576–577, quoting *Hays v. Patton-Tully Transp. Co.*, 844 F. Supp. 1221, 1223 (W.D. Tenn. 1993) ("Sexual harassment has never been a common law tort; as a cause of action, it is a statutory creation").  "To hold otherwise 'would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law.'" *Id.* at 577, quoting *Hays* 844 F. Supp. at 1223..  "Thus[,] a negligent supervision claim could lie in a sexual harassment case if supported by a viable claim of independent tortious conduct as recognized at common law." *Id.*

Assault and battery are types of independent tortious conduct that can support such a negligent supervision claim.  *See id.* ("For example, a negligent supervision claim predicated on a battery might be pursued under a theory that the employer was negligent in allowing the battery to happen.").  An assault is defined as an "intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 107 (D.D.C. 2011), citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation marks and citation omitted).  And a tortious battery is "an intentional act that causes a harmful or offensive bodily contact." *Id.*

Here, plaintiffs' immediate supervisor committed independent acts of tortious conduct, separate from the sexual harassment, that support plaintiffs' negligent supervision claim.  *See Boyd*

*v. O'Neill*, 273 F. Supp. 2d 92, 96 (D.D.C. 2003) ("Assault, for example, is actionable apart from Title VII because it is beyond the meaning of discrimination.  Such a highly personal violation does not fall within Title VII's domain, even if arising from the same facts as a claim of discrimination.") (internal citation omitted).  The complaints include multiple allegations of tortious threats, *see e.g.*, Martinez Compl. ¶¶ 45–46, 53; Recinos Compl. ¶¶ 51, 59, and Lainez assaulted Martinez on June 30 and July 7, Martinez Compl. ¶¶ 51–54, 59–64, and Recinos on July 6, Recinos Compl ¶¶ 49–52.  These allegations of criminal acts more than suffice for purposes of a negligent supervision claim.

The complaint includes multiple allegations supporting a finding that the defendants were on notice of the risk posed by their employee.  On June 30, 2016, when Martinez was physically assaulted for the first time after weeks of threats, she informed a supervisor who was senior to Lainez of what he had done and that she feared for her physical safety.  Martinez Compl. ¶ 55.  By that point, if not before, defendants were on notice that Lainez was dangerous and posed a threat to plaintiffs' safety, and they therefore had a duty to adequately supervise him.  *See Godfrey*, 559 F.3d at 571.  Defendants breached their duty when they failed to take any steps to remove Lainez from the workplace, and instead ordered Martinez to return to work with Lainez despite her concerns.  Martinez Compl. ¶¶ 56–57.  Only one week after Martinez reported the assault, she was attacked again, and Recinos was also assaulted.  Martinez Compl. ¶¶ 60–64; Recinos Compl. ¶¶ 49–51.  For these reasons, then, the Court will grant plaintiffs' motions for default judgment as to the negligent supervision claims.

## V.      Damages

### A.  Compensatory and Punitive Damages under Title VII and the DCHRA

Plaintiffs ask the Court to award them each $400,000 in compensatory damages and

$200,000 in punitive damages.  Martinez Mot. at 28; Recinos Mot. at 28.  Section 1981a sets forth

the amount of damages available under Title VII:

> The sum of the amount of compensatory damages awarded under this
> section for future pecuniary losses, emotional pain, suffering,
> inconvenience, mental anguish, loss of enjoyment of life, and other
> nonpecuniary losses, and the amount of punitive damages awarded under
> this section, shall not exceed, for each complaining party—
>
> > **(A)** in the case of a respondent who has more than 14 and fewer than
> > 101 employees in each of 20 or more calendar weeks in the current
> > or preceding calendar year, $50,000;
> > **(B)** in the case of a respondent who has more than 100 and fewer
> > than 201 employees in each of 20 or more calendar weeks in the
> > current or preceding calendar year, $100,000; and
> > **(C)** in the case of a respondent who has more than 200 and fewer
> > than 501 employees in each of 20 or more calendar weeks in the
> > current or preceding calendar year, $200,000; and
> > **(D)** in the case of a respondent who has more than 500 employees in
> > each of 20 or more calendar weeks in the current or preceding
> > calendar year, $300,000.

42 U.S.C. § 1981a(b)(3).

Plaintiffs assert that defendants "had over 500 employees in the year preceding the filing

of the complaint," Martinez Mot. at 20; Recinos Mot. at 21, and so the cap for compensatory and

punitive damages for the Title VII claims would be $300,000 per plaintiff.[4]  They point to an article

about Francisco Gali posted on a website called "Profiles in Success," which states that GSI Group

---

4      In the D.C. Circuit, the $300,000 cap appears to apply per plaintiff and not per claim.  *See
Peyton v. DiMario*, 287 F.3d 1121, 1124 (D.C. Cir. 2002) (noting that the trial court "reduced the
amount of compensatory damages recoverable to $300,000, the statutory maximum under Title
VII" where plaintiff had prevailed on both hostile work environment and retaliation claims).  *Jean-
Baptiste v. Dist. of Columbia.*, 931 F. Supp. 2d 1, 14 (D.D.C. 2013).

"is a $30 million business employing over 1,000 staff members."  Gordon J. Bernhardt, *The Power of Persistence, Francisco Gali*, Profiles in Success, https://profilesinsuccessbook.com/profile-success/francisco-gali/ (last accessed Sept. 17, 2020).   While this is a default situation, and it was the defendants who forewent the opportunity to provide discovery on this and other issues, some supplementation of this showing – or a recitation of what efforts were made to gather additional information and why they were unsuccessful – would be beneficial to the Court before it determines whether subsection 1981a(3)(D) is applicable.

Unlike Title VII, the DCHRA has no statutory cap on compensatory or punitive damages, and courts are not bound by Title VII's provisions when it comes to calculating damages under D.C. law.  *See Daka, Inc. v. Breiner*, 711 A.2d 86, 102 (D.C. 1998); *see Jean-Baptiste v. Dist. of Columbia.*, 931 F. Supp. 2d 1, 18–19 (D.D.C. 2013).   Any amount awarded that exceeds the $300,000 Title VII cap for each plaintiff would be allocated to the violations of the DCHRA.  *See Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1349–50 (D.C. Cir. 1999).

To determine the amount of compensatory damages in Title VII and DCHRA cases, courts will typically examine whether plaintiffs have presented evidence showing actual harms incurred as a result of the harassment or retaliation. The harms can be both economic – medical bills or other expenses – or non-economic – pain and suffering, anguish, etc.  This is a fact intensive inquiry: factfinders consider the length of time a plaintiff endured injuries, the severity of the

injuries, and the permanence of the injuries in arriving at an actual number.[5]   The size of the award

may also turn upon the factfinders' assessment of the demeanor and credibility of the plaintiffs

themselves.

To support the claims for damages, each plaintiff submitted an affidavit detailing the sexual

harassment and assault she endured.   *See generally* Aff. of Lilian Martinez [Dkt. # 22-1]

("Martinez Aff."); Aff. of Carmen Recinos [Dkt. # 23-1] ("Recinos Aff.").   They also each

submitted, under seal, photographs taken by hospital staff in July of 2016 of the bruises and scrapes

they sustained as a result of the assaults.   Martinez Mot. at 19–20, citing Ex. 1 – Medical

Documentation (SEALED) [Dkt. # 23]; Recinos Mot. at 20, citing Ex. 1 – Medical Documentation

(SEALED) [Dkt. # 24].   The affidavits submitted by plaintiffs also state that they suffer from

depression, anxiety, headaches, back pain, and lack of sleep as a result of the hostile work

environment and retaliation they suffered.   Martinez Aff. ¶ 30; Recinos Aff. ¶ 30.   But they submit

no documents showing medical costs incurred, if any, such as any medical bills, hospital records,

insurance documents, therapists' invoices, etc.   Plaintiffs request $400,000, but they do not specify

whether this is only for emotional harm and suffering or if it includes economic harm as well.   *See*

Martinez Mot. at 21; Recinos Mot. at 21.   Before the Court determines the amount of the award, it

would be helpful to hear from the plaintiffs directly concerning the duration and severity of the

---

5       Damages awarded must be fair compensation, no more and no less.   Compensatory
damages may be awarded for emotional pain and suffering, inconvenience, mental anguish,
embarrassment, humiliation, or loss of enjoyment of life that each plaintiff must prove by a
preponderance of the evidence that she experienced as a consequence of the unlawful conduct.
But no evidence of the monetary value of such intangible things such as pain or suffering need be
introduced into evidence.   There is no exact standard for fixing the compensation to be determined
for these elements of damages.   *See* Jury Instructions, *Okpala v. District of Columbia*, Civ. A.
No. 09-cv-1948 (RLW), Dkt. 74, at 22 (D.D.C. Nov. 14, 2011).

symptoms of emotional distress that they describe, and to ascertain whether there are any economic elements of their damage claims that should be considered.

Title VII allows for an award of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); *Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 180 n.8 (D.D.C. 2014) ("[T]he cap applies to the combined total of all damages awarded."). The Supreme Court has noted that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n.*, 527 U.S. 526, 535 (1999).  "In other words, the plaintiff must put forth some evidence regarding the mental state of the employer-defendant to recover punitive damages."  *Robinson*, 4 F. Supp. 3d at 180.

The reasonableness of punitive damages under the DCHRA is determined by three "guideposts": "(1) the reprehensibility of the defendant's conduct, (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages and any potential civil or criminal penalties." *Daka*, 711 A.2d at 101.  The Court should consider what amount would be sufficient "to punish unlawful conduct and to deter its repetition." *See id.* at 98.

The Court is persuaded that punitive damages are warranted in this case, particularly in light of supervisor Lisette's callous and intentional enabling of Lainez's unacceptable and tortious behavior, but its determination of the appropriate amount should await its decision on compensatory damages given the relationship between the two forms of relief.

**B.  Damages under FLSA, DCMWRA, and DCWPCL**

A plaintiff who prevails on a motion for default judgment on her claims arising under the FLSA, DCMWRA, and DCWPCL is entitled to recover her unpaid wages, liquidated damages, and her reasonable attorneys' fees and costs.  29 U.S.C. § 216(b); D.C. Code § 32-1012(a)–(b); D.C. Code § 32-1303(4); *see Pleitez v. Carney*, 594 F. Supp. 2d 47, 50, 53 (D.D.C. 2009).

Liquidated damages under the DCMRWA are "equal to the treble the amount of unpaid wages" D.C. Code § 32-1012(b)(1), while under the FLSA liquidated damages are equal to the amount of unpaid wages, 29 U.S.C. § 216(b), and under the DCWPCL, liquidated damages amount to "10 per centum of the unpaid wages for each working day during which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller.  D.C. Code § 32-1303(4).  But, because "[a]n employee may not recover for nonpayment of wages separately under the FLSA, the DCMWRA, and the DCWPC[L] since that would result in a double (or triple) recovery for unpaid wages," *Perez v. C.R. Calderon Constr., Inc.*, 221 F. Supp. 3d 115, 139 (D.D.C. 2016), the Court will calculate liquidated damages as three times the amount of unpaid wages, since that accounts for the highest award to which plaintiffs are entitled.

Martinez never received her last paycheck, which she asserts would have covered two weeks of work, or 40 hours, at $10.50 per hour, for a total of $420.00.  Martinez Compl. ¶¶ 34, 77; Martinez Aff. ¶ 27.  Based on that, her liquidated damages would total $1,260, and Martinez maintains she is entitled to $1,680 for the violations of the FLSA, DCMRWA, and DCWPCL.

Recinos avers that defendants failed to pay her for 20 hours of work at $11.50 per hour, totaling $230.00.  Recinos Aff. ¶ 27.  Furthermore, defendants failed to pay her for 100 hours of work in June 2016 – 80 hours at regular pay and 20 hours of overtime pay – totaling $1,265.00.

*Id.* Overtime wages are paid at the rate of one-and-a-half times the employee's regular hourly rate. 29 U.S.C. §§ 206–07; D.C. Code § 32-1003(c). That amounts to $1,495.00, and liquidated damages would equal $4,485. Therefore, Recinos maintains she is entitled to $5,980.00 for the violations of the FLSA, DCMRWA, and DCWPCL.

While the plaintiffs have attested to their salary, it would assist the Court in calculating the judgment if the record was supplemented with some documentation – such as sample pay stubs – showing the rates at which they were to be paid in June of 2016.

### C.  Damages for Negligent Supervision

Compensatory damages for the commission of a tort such as negligent supervision are generally calculated based upon a consideration of the same factors underlying the compensatory damage calculation for the employment claims. *See, e.g.*, D.C. Std. Civ. Jury Instr. § 12-1 ("If you find for [plaintiff], then you must decide what amount of money will fairly and reasonably compensate [her] for the harm that you find was caused by [defendants]."); D.C. Std. Civ. Jury Instr. § 13-1 (instructing that the following elements may be considered in awarding damages: the extent and duration of any physical injuries, the overall physical and emotional well-being, any physical pain and emotional distress that plaintiff has suffered or will suffer, any inconvenience plaintiff has experienced or will experience, any medical expenses incurred, and more). This aspect of the award will await the supplementation already requested and the Court's receipt of plaintiffs' testimony at a hearing.

### D.  Attorney's Fees

In accordance with plaintiffs' request, counsel will have thirty days from the date of this order to submit the necessary materials in support of their request for attorney's fees. *See Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (plaintiffs bear the burden of establishing

the reasonableness of the hourly rates charged by their attorneys, and "[w]hether an hourly rate is reasonable turns on three subelements: (1) the attorney's billing practices, (2) the attorney's skill, experience, and reputation and (3) the prevailing market rates in the relevant community"); *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1323 (D.C. Cir. 1982) (plaintiffs must submit "sufficiently detailed information about the hours logged and the work done" and the "complete and standardized time records" must "accurately reflect the work done by each attorney.").

## CONCLUSION

For the foregoing reasons, plaintiffs' motions for default judgment are **GRANTED**.  It is **FURTHER ORDERED** that plaintiffs may submit additional documentation supporting their claims for damages by November 2, 2020.  A hearing in this matter will be scheduled on a date to be determined; the Court's Deputy Clerk will contact counsel to identify available dates.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  October 2, 2020